# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-01427-SCT

*LESLIE GALLOWAY, III a/k/a LESLIE*
*GALLOWAY a/k/a LESLIE "BO" GALLOWAY, III*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/05/2018 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| TRIAL COURT ATTORNEYS: | ANTHONY N. LAWRENCE, III |
| | NESHONDRIA DEQUANDRA ELLERBY |
| | JOSEPH RICHARD TRAMUTA |
| | VANESSA JUDITH CARROLL |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ANNA MARIE ARCENEAUX |
| | THOMAS M. FORTNER |
| | OLIVIA ENSIGN |
| | BRIAN W. STULL |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CAMERON LEIGH BENTON |
| | ASHLEY LAUREN SULSER |
| | MATTHEW WYATT WALTON |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 05/07/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Leslie Galloway appeals from the Jackson County Circuit Court's denial of his 2015

petition for post-conviction relief (PCR) pertaining to his 2007 guilty plea to carjacking, a

conviction that was used as an aggravating circumstance in Galloway's 2010 capital-murder

trial at which Galloway received a death sentence.

¶2. Galloway claimed in the petition that his defense counsel Wendy Martin had an actual conflict of interest because, before becoming his defense counsel, Martin had served as an assistant district attorney in the same case, unbeknownst to Galloway. Galloway asserted that this deprived him of due process and effective assistance of counsel, requiring automatic reversal of his carjacking conviction. Galloway further asserted that, if the court found that Martin's representation created only a potential conflict of interest, reversal is still required because he was prejudiced by Martin's failing to conduct a reasonable investigation before advising him to plead guilty.

¶3. The trial court ruled that Galloway's PCR claim was time barred under Mississippi's Uniform Post-Conviction Collateral Relief Act (UPCCRA), having been filed more than seven years after Galloway's conviction for carjacking. The trial court alternatively found no merit to Galloway's PCR claim, time bar notwithstanding. Accordingly, the trial court denied Galloway's PCR petition.

¶4. We agree with the trial court that Galloway's PCR claim is time barred under the UPCCRA. *See* Miss. Code Ann. § 99-39-5(2) (Rev. 2015) ("A motion for relief under the this article shall be made . . . within three (3) years after entry of the judgment of conviction" in the case of a guilty plea.).

¶5. We also agree with the trial court that, time bar notwithstanding, there is no merit to Galloway's PCR claim. The trial court found that, at the time Martin represented Galloway as his defense attorney, Martin did not realize that she had previously worked on the same

2

case as an assistant district attorney. Thus, according to the trial court, no actual conflict existed.

¶6. We affirm.

**FACTS AND PROCEDURAL HISTORY**

**1.      Events Before Galloway's 2007 Carjacking Guilty Plea**

¶7. Galloway was arrested in July 2001 by Jackson County authorities for a carjacking that had occurred two nights before in Moss Point, Mississippi. Galloway was indicted for the offense in April 2002.[1] Galloway failed to appear for his arraignment, and the trial court issued a bench warrant in August 2002 for Galloway's arrest.[2]

¶8. On September 27, 2002, a waiver of arraignment was entered in Galloway's case, and an agreed trial date was set for November 25, 2002. At the time, assistant district attorney Wendy Martin represented the State in the matter. And Brenda Locke from the Jackson County Public Defender's Office represented Galloway. An agreed order signed by Martin and Locke to set aside the bench warrant was also entered on September 27, 2002.

¶9. On October 4, 2002, Locke filed a motion for discovery and a speedy-trial demand. A notice of trial was filed on December 16, 2002, setting the cause for trial on March 3, 2003.

¶10. On March 3, 2003, an order for continuance was entered at the request of the

---

[1] The indictment alleged that Galloway "knowingly by force and violence" took a motor vehicle "from Monica Simmons's immediate actual possession . . . ."

[2] The order was signed by Circuit Court Judge James Backstrom.

3

"defendant/State." The order was signed by Martin and public defender Brice Kerr.[3]

¶11. In May 2003, at the request of Martin, subpoenas were filed for the following individuals: Monica Simmons, Erica Fairley, Carlton Logan, Anthony Cooley, and William Trussell.

¶12. At a May 13, 2003 docket hearing, Martin informed the trial court that "a plea recommendation has been made, and the State could be ready for a trial, if necessary." Locke, however, informed the trial court that she was unable to "get in touch" with Galloway after having made repeated attempts. Martin then requested a bench warrant for Galloway, which the trial court granted. The case sat idle on the docket from May 2003 until January 2004.

¶13. In January 2004, Anthony N. Lawrence, III, took office as the new district attorney. Martin had run unsuccessfully against Lawrence for the position, and she left the district attorney's office soon after.

¶14. In March 2004, the trial court entered an order passing Galloway's case to the inactive files. Tanya Hasbrouck, the new assistant district attorney assigned to the case, signed the order.

¶15. In October 2006, Hasbrouck informed the trial court that Galloway was in the Pascagoula city jail for an unrelated matter. Galloway was then transported to the Jackson County courthouse, at which time public defender Robert Rudder informed the trial court that

---

[3] This order was signed by Circuit Court Judge Robert Krebs. Judge Krebs presided over Galloway's 2007 guilty-plea hearing. Judge Krebs also presided over the underlying PCR.

4

he would be representing Galloway. Rudder requested a continuance to the next term of court, which the trial court granted, continuing the case to January 25, 2007.

¶16. On January 25, 2007, Hasbrouck informed the trial court that Galloway had "a couple of unindicted cases," and she requested that the court pass the case to the next court term. Rudder also informed the court at that time that Galloway had "two possession cases out of Pascagoula from early in the Fall" for which Rudder was trying to obtain police reports.

¶17. On February 22, 2007, Martin entered an appearance as defense counsel for Galloway, at which time she filed a request for discovery and a demand for speedy trial. The record does not show who hired Martin to represent Galloway. Martin later testified at the evidentiary hearing on March 22, 2018, that she could not remember who had hired her to represent Galloway; she said, "It was probably a family member or a girlfriend."

¶18. In March 2007, Galloway entered a plea of not guilty to the carjacking charge, and a trial date was set for early May 2007.[4] In April 2007, Martin requested a continuance on Galloway's behalf, which the trial court granted.

### 2. Galloway's 2007 Guilty-Plea Hearing

¶19. On May 17, 2007, represented by Martin, Galloway appeared before the trial court after signing a petition to plead guilty to the crimes of carjacking and possession of a controlled substance.

¶20. During the plea colloquy, Galloway informed the trial court that he was twenty-three

---

[4] Galloway also stood charged with possession of a controlled substance, for which he had been arrested in 2006. Galloway, however, seeks relief only from his carjacking conviction.

years of age, that he had graduated from high school, and that he could read and write. Galloway acknowledged that he had fully discussed the plea petition with Martin and that it was his signature on the plea petition.

¶21. Galloway stated that he had received his indictment and that he understood he was charged with "carjacking and possession of a controlled substance, crack cocaine." Galloway told the trial court that Martin had discussed with him the elements of the crimes the State had to prove. Galloway also said that he knew the maximum and minimum sentences and the fines for each charge.

¶22. Galloway said he understood that by pleading guilty, he was admitting that he was guilty. Galloway stated that no one had threatened him in order to make him plead guilty. And other than plea negotiations with the district attorney's office, Galloway said that no one, including his attorney, had promised him anything for his guilty plea.

¶23. Galloway told the trial court that he was satisfied with Martin's services, that she properly advised him of his best interests, and that he had no complaints about Martin's representation. Galloway further stated that he understood the constitutional rights he would be waiving by pleading guilty.

¶24. When asked by the trial court, "what[,] in your own mind[,] makes you think you're guilty?" Galloway responded, "I had possession of a controlled substance in my pocket, and I took a car by force."

¶25. Afterwards, Hasbrouck submitted to the trial court the following plea recommendation:

8 years in the Mississippi Department of Corrections, on each charge to run concurrent, recommendation for the [Regimented Inmate Discipline] program, retain jurisdiction, 4 years of Post-Release supervision, with a condition that [Galloway] complete the Adult Challenge Program, $1,000 fine on each case, $250 restitution[,] . . . lab fees[,] . . . [c]ourt costs, and we're going to ask that he be required to stay away from the victim . . . .

¶26. The trial court asked Galloway if there was anything he or Martin would like to say regarding any mitigating circumstances before rendering Galloway's sentence. Martin stated the following:

Yes, Your Honor. Mr. Galloway [had] just turned 18 when this carjacking happened. He was in high school. Basically, Your Honor, what happened is they had been drinking a little, they had gotten in the car with the girls. They had been riding around. The girls decided that they wanted them to get out. Mr. Galloway agreed to put $5 worth of gas in the car. They drove around a little more, and they got into an argument. He pulled the girl out of the car and drove home, because he didn't want to walk. This is what the argument started over, about him getting out of the car and walking. He was very young. When he got into this trouble, - - Your Honor, his mother is here. She's been here all day, and his sisters. She moved. She took him out of high school and moved to Greene County, because she wanted to get him away from his friends. . . . [T]he next year, his senior year, he graduated with honors from Green County, and had not been in any trouble. He worked for many years after this happened. This was in 2001, this incident, Your Honor. There was a bench warrant taken out. He never left Jackson County. He worked for three years at the Brass Hanger Cleaners as a presser right when this happened. And he can show you his hand when he got caught with possession.

Basically, Your Honor, after working at Brass Hanger Cleaners, he severely burned his hand while pressing. He was out on workers' compensation. He was taking pain meds, and he started experimenting with crack cocaine, Your Honor.

He had not been in any trouble, or any arrests at all, since the time he was 18 until this last incident, Your Honor. We would ask the Court for some mercy. His mother and family are here in support of him. And he's been in jail for 7 months, Your Honor. We would [ask] that you, because of his age, consider time served, and putting him on 5 years Post-Release Supervision. He says that he learned his lesson. He's never been in jail before. He's never

7

been in jail before this, and he is pretty adamant that he doesn't like it, and he's not going back. And he's just asking for a chance, Your Honor.

¶27. The State then responded as follows:

Your Honor, first off, I did make an error on restitution. It should be $680. I was just looking at the cost to get the car out of impound. I think there were some other items that was [sic] never returned.

Your Honor, the reason for the recommendation initially is because this case happened in 2001, and the bench warrant was put out for the defendant in 2002, and it had not come up until now, and a substantial amount of time had passed. But the victim, at the time, not only did he drag her out of the car, but force was used. I mean, she had bruises on her legs. She had a black eye. There was a struggle involved. And we feel that that is a very serious charge. And we do understand that he did graduate with honors, with what his attorney has said; but we still feel that it is a crime of violence and a serious charge.

He also has the new charge in 2006, a drug charge, that indicates that he may have a drug problem, which is initially why we had talked about drug treatment, which is what the victim had indicated that she would have like to have seen him get is [sic] drug treatment, and we thought that the Adult Challenge Program would be good to help get his in order after that, concerning what was involved initially on the carjacking case, as well as the drug case. And we feel it's a very fair recommendation in light of the circumstances. He's looking at doing up to 15 years if he went to trial on it, and [the victim] is willing to go forward. She does not want to. She doesn't have to. She is still scared. She's recently had a baby, and all that comes into play for the recommendation.

¶28. The trial court found that Galloway's guilty plea was "freely, voluntarily, and intelligently made" and accepted it. The court sentenced Galloway to eight years in the Mississippi Department of Corrections (MDOC) on each charge, the sentences to run concurrently, with four years of post-release supervision. The court said it would recommend Galloway's participation in the Regimented Inmate Discipline (RID) program and that the court would retain jurisdiction of the case pending Galloway's completion of it.

8

The court ordered Galloway to attend the "Adult Challenge" program, to pay a $1,000 fine for each charge, to pay $680 in restitution along with lab fees and court costs, and to stay away from the victim.

¶29. Galloway returned back to court nine months later on February 15, 2008. The State advised the trial court that Galloway had completed the RID program. And the State requested that the remainder of Galloway's sentence, apart from the four years of post-release supervision, be suspended on the condition that Galloway complete the "Adult Challenge" program and pay the fines, fees, and court costs listed in the sentencing order.

¶30. Martin agreed to the State's recommendation, but she requested that the "Adult Challenge" program requirement be excluded. The trial court declined the request. The trial court, however, found that Galloway had met the prerequisites for post-release supervision and issued an order adjudicating Galloway guilty of carjacking and possession of a controlled substance. The court suspended the remainder Galloway's original eight-year sentence, except for the four years to be served on post-release supervision and the requirement that Galloway pay the fines, fees, and court costs required by the original sentencing order.

### 3. Post-Conviction Relief

¶31. On May 1, 2015, Galloway filed a PCR motion to vacate his conviction and sentence for carjacking. Galloway asserted that when Martin transitioned from Galloway's prosecutor to his defense attorney in the very same case without disclosing her conflict or seeking a waiver from him, she deprived Galloway of his Sixth Amendment right to conflict-free counsel. Galloway claimed that the result created an actual conflict of interest that adversely

9

affected Martin's representation of him and denied him his right to due process. Citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), and *Kiker v. State*, 55 So. 3d 1060 (Miss. 2011), Galloway contended that this requires reversal of his carjacking conviction.

¶32. Galloway also asserted that if it were found that Martin's representation created only a potential conflict of interest, reversal is still required because Martin's conflict prejudiced him. Citing *Strickland v. Washington*, Galloway contended that Martin failed to conduct a reasonable investigation before advising him to plead guilty. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Galloway claimed that a reasonable investigation would have uncovered substantial evidence that severely undermined the credibility of the State's witnesses and created a reasonable doubt as to his guilt for the carjacking charge. And, Galloway continued, there was a reasonable probability that this evidence would have altered Galloway's decision to plead guilty.[5] Galloway further claimed that the State violated *Brady v. Maryland* because it failed to disclose favorable, exculpatory, and material evidence to the defense.[6]

---

[5] Galloway also cites *Hill v. Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985), which held that the two-part test announced in *Strickland* also applies to guilty-plea proceedings. *See also Coleman v. State*, 483 So. 2d 680, 683 (Miss. 1986) (adopting *Hill*'s test in the context of guilty pleas and holding that the defendant must show that were it not for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial).

[6] In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

¶33. The trial court conducted an evidentiary hearing, at which the trial court heard testimony from, among others, Martin, Locke, Hasbrouck, and Professor Benjamin Cooper, an expert on legal ethics. Afterwards, the trial court issued a detailed opinion order denying Galloway's PCR petition. The trial court, as mentioned, held that Galloway's PCR claim is time barred and otherwise without merit.

¶34. The trial court found credible Martin's testimony that she did not realize, at the time she represented Galloway at his guilty plea hearing in 2007 and at the follow-up sentencing hearing in 2008, that she had worked as a prosecutor in the same carjacking case in 2002 and 2003. The trial court concluded as follows:

> Nine months elapsed between Galloway's arraignment and his case being passed to the inactive files. Almost four years later, Martin entered her appearance. Martin's caseload of thousands in a four year period at the D.A.'s office coupled with the lack of substantive activity in the case such that it was passed to the inactive files lends credence to Martin's testimony that she had no memory of Galloway or the facts of his case. The [c]ourt is unable to find that Martin consciously chose between or blended the competing interests of the State and Galloway based on speculation and generous inferences.

¶35. Accordingly, the trial court ruled that Galloway failed to demonstrate that his Sixth Amendment right to counsel was violated by an actual conflict of interest.

¶36. The trial court also denied Galloway's claim that he was prejudiced by Martin's failure to conduct a reasonable investigation in the case before advising Galloway to plead guilty to carjacking. And the trial court rejected Galloway's contention that substantial evidence existed that would have severely undermined the State's witnesses in the carjacking case, or that would have showed that a *Brady* violation had occurred or that would have created a reasonable doubt as to Galloway's guilt for carjacking.

11

¶37. The trial court found that, although Galloway submitted affidavits from several people whom Martin never contacted, none of the affiants were fact witnesses with personal knowledge of the crime that occurred on July 15, 2001. The trial court noted that shortly after Galloway's arrest for carjacking, Galloway admitted to the police that he had ridden in Simmons's vehicle with Simmons on the night Simmons said she was carjacked. The trial court also noted that Simmons had acknowledged that she initially had told the police that an individual named Paul Martin was the perpetrator, but she said the perpetrator had identified himself to her as Paul Martin. The trial court pointed out that in Simmons's handwritten statement to the police, the name Paul Martin was written in quotation marks.

¶38. Citing *Strickland*, 466 U.S. at 681, the trial court said that an attorney can still be constitutionally effective without investigating every plausible line of defense. Time limitations and money may "force early strategic choices, often based solely on conversations with the defendant and a review of the prosecution's evidence." *Id.* And an attorney's decision to forego an investigation to pursue a plea deal rather than defend at trial can be reasonable under the circumstances. *Id.*

¶39. The trial court noted that Galloway was facing up to fifteen years in prison if convicted of carjacking. But he was sentenced to eight years with four years of post-release supervision and was recommended to the RID program. Less than one year later, after successfully completing the program, the remainder of Galloway's sentence was suspended apart from the four years of post-release supervision.

¶40. The trial court found that Martin's decision to forego an investigation to pursue a plea

12

deal, that included the opportunity for release and significant reduced prison time was reasonable. The trial court rejected Galloway's assertion that his lenient sentence is irrelevant since Galloway was a first-time offender and could have possibly been acquitted. The trial court stated, "It is a matter of public record in Jackson County that first-time offenders of violent crimes rarely receive such a lenient sentence."

## DISCUSSION

¶41. At the outset, we agree with the trial court that Galloway's PCR claim is time barred under the UPCCRA's three-year statute of limitations. *See* Miss. Code Ann. § 99-39-5(2); *Jordan v. State*, 268 So. 3d 570, 571 (Miss. 2018) (barring PCR claim asserting ineffective assistance of counsel based on a conflict of interest because the claim did not "surmount the time, waiver, and successive-writ bars" set forth by the UPCCRA).

¶42. Time bar notwithstanding, the trial court also concluded, in a thorough and detailed order containing the court's factual findings, that Galloway failed to demonstrate a violation of his Sixth Amendment rights under either the *Crawford* standard or the less burdensome *Cuyler* standard. We affirm the trial court's decision.

¶43. Conflict-of-interest claims involving attorneys in criminal cases are a species of ineffective assistance of counsel under the Sixth Amendment. *Strickland*, 466 U.S. at 688 ("Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."). Such claims are evaluated under one of two separate standards: the *Strickland* standard or the standard from *Cuyler*, 446 U.S. 335. *Crawford v. State*, 192 So. 3d 905, 917-18 (Miss. 2015) (citing *Strickland*, 466 U.S. at 687-

13

92).

¶44.    The *Strickland* standard requires a showing of deficient performance that prejudiced the defense.  *Strickland*, 466 U.S. at 687.  The *Cuyler* standard relieves the burden of showing prejudice when a claimant can show that "an actual conflict of interest adversely affected his lawyer's performance."  *Id.* at 692 (internal quotation marks omitted) (quoting *Cuyler*, 446 U.S. at 350).  "Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'"  *Id.* (quoting *Cuyler*, 446 U.S. at 350).

¶45.    *Strickland* explained that the *Cuyler* standard provides a "more limited[] presumption of prejudice[ ]" than in instances in which there is "[a]ctual or constructive denial of the assistance of counsel altogether[ ]" or in which the "state interfere[s] with counsel's assistance." *Strickland*, 466 U.S. at 692.  "Prejudice in th[o]se circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost."  *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

¶46.    The *Cuyler* standard "is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above[:]" denial of counsel altogether or interference by the State with counsel's assistance. *Id.*  Rather, the *Cuyler* standard "sets a lower threshold for reversal of a criminal conviction than does the *Strickland* test . . . ."  *Crawford v. State*, 192 So. 3d at 917-18 (citing *Strickland*, 466 U.S. at 687-88).

¶47.    As *Crawford* recognized, four seminal United States Supreme Court cases deal with conflict-of-interest claims under the Sixth Amendment.  *Crawford*, 192 So. 3d at 917-18

14

(citing *Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); *Cuyler*, 446 U.S. 335; *Wood v. Georgia*, 450 U.S. 261, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)). Each case concerned a lawyer's conflict of interest based solely on representation of multiple clients. *Crawford*, 192 So. 3d at 918. And each case dealt with a trial court's duty to inquire into the possible conflict.[7] *Id.*

¶48.    As the trial court explained, "[a] mere possibility of a conflict does not raise a presumption of prejudice . . . ." *Hernandez v. Johnson*, 108 F.3d 554, 560 (5th Cir. 1997); *see also Stringer v. State*, 485 So. 2d 274, 275 (Miss. 1986) ("[A] potential for conflict or hypothetical or speculative conflicts will not suffice for reversal."). "[U]ntil a defendant shows that his counsel actively represented conflicting interest, he has not established the constitutional predicate for his claim of ineffective assistance." *Hernandez*, 108 F.3d at 560 (internal quotation marks omitted) (quoting *Cuyler*, 446 U.S. at 350). An actual conflict exists "when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing

---

[7] In *Holloway*, the Supreme Court applied an automatic-reversal rule only when defense counsel is forced to represent codefendants over a timely objection, unless the trial court has determined that there is no conflict. *Holloway*, 435 U.S. at 488. *Cuyler* declined to extend *Holloway*'s automatic-reversal rule to a situation in which no one objected to a multiple representation by the same counsel. *Cuyler*, 446 U.S. at 337-38. In *Wood*, the record suggested that the trial court knew or should have known that an actual conflict existed, and the *Wood* Court remanded the case for a determination of whether an actual conflict existed. *Wood*, 450 U.S. at 272-73. In *Mickens*, the Court clarified that even if the trial court knew or should have known potential conflict existed, a defendant still must establish that the conflict adversely affected counsel's performance. *Mickens*, 535 U.S. at 167-73.

interests of a former or current client." **Perillo v. Johnson**, 205 F.3d 775, 781 (5th Cir. 2000). And "[i]t must be demonstrated that the attorney made a choice between possible alternative courses of action . . . . If [counsel] did not make such a choice, the conflict remained hypothetical." **United States v. Garcia-Jasso**, 472 F.3d 239, 243 (5th Cir. 2006) (internal quotation marks omitted) (quoting **Stevenson v. Newsome**, 774 F.2d 1558, 1561-62 (11th Cir. 1985)).

¶49. Based on all of the evidence presented, the trial court concluded that Galloway failed to demonstrate an actual conflict of interest. The trial court found that Martin had no memory of Galloway or the facts of his case, and the trial court was unable to find, beyond speculation and generous inferences, that Martin "consciously chose between or blended the competing interests of the State and Galloway." Accordingly, Galloway's conflict-of-interest claim remained hypothetical.

¶50. The trial court reached this conclusion based on factual findings drawn from the evidence, which we are not permitted to second guess. *See* **Walker v. State**, 230 So. 3d 703, 704 (Miss. 2017) (trial court's factual finding(s) may not be disturbed on appeal unless shown to be clearly erroneous). Accordingly, we must affirm the trial court's decision.

¶51. In so holding, however, we must express our great consternation with the obvious lack of diligence on Martin's part in this case. Irrespective of Martin's memory or recollection of Galloway and the facts of his criminal case, a former prosecutor such as Martin should have spotted and properly acted on indisputable red flags here before taking on Galloway's representation. Martin certainly knew that she had been employed in the district attorney's

16

office at the time of Galloway's crime and indictment. And while, as the trial court found, the activity in Galloway's criminal case in which Martin was involved as a prosecutor had not been substantial, it was enough that a former prosecutor could have discovered it.

¶52. We point out that some states have dealt with these type of situations as a *per se* conflict of interest warranting automatic reversal. *See, e.g.*, **People v. Lawson**, 644 N.E.2d 1172, 1183 (Ill. 1994); **Skelton v. State**, 672 P.2d 671 (Ok. 1983); **State v. Gibbons**, 462 P.2d 680 (Or. Ct. App. 1969). Other courts adhere to a prejudicial-showing requirement but condemn such practice nonetheless. *E.g.*, **Flaherty v. State**, 221 So. 3d 633, 637 (Fla. Dist. Ct. App. 2017).

¶53. We also note that the Supreme Court of Wisconsin has spoken to such circumstances as follows:

> In all these situations, the court must be empowered to disqualify attorneys in the interest of justice. In **State v. Miller**, 160 Wis. 2d at 653, 467 N.W.2d 118 [(1991)], this court stated that "An actual conflict or serious potential for conflict of interest imperils the accused's right to adequate representation and jeopardizes the integrity of the adversarial trial process and the prospect of a fair trial with a just, reliable result."

**State v. Love**, 594 N.W.2d 806, 816 (Wis. 1999). **Love** reiterated what the United States Supreme Court enumerated in **Wheat v. United States**, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988), "when a criminal defense attorney has an actual or serious potential conflict of interest[:]"

> First, a court's institutional interest in ensuring that "criminal trials are conducted within the ethical standards of the profession." **Wheat**, 486 U.S. at 160. Second, a court's institutional interest in ensuring that "legal proceedings appear fair to all who observe them." **Id.** Third, a court's institutional interest that the court's "judgments remain intact on appeal" and be free from future

17

attacks over the adequacy of the waiver or fairness of the proceedings. *Id.* at 161.

*Love*, 594 N.W.2d at 816-17 (quoting *Miller*, 467 N.W.2d at 120 n.2).

¶54.    *Love* also took into consideration circumstances in which such serial-representation claims are alleged for the first time in a post-conviction proceeding, stating,

> In a post-conviction motion, the institutional factors are different. If a defendant has received a fair trial, the court has an institutional interest in protecting the finality of its judgment. Moreover, theoretical imperfections and potential problems ought not be treated more seriously than real deficiencies and real problems, for such skewed values would undermine public confidence in the administration of justice.

*Id.* at 817.

¶55.    In striking a balance, *Love* issued the following rule:

> We hold that in order to establish a Sixth Amendment violation on the basis of a conflict of interest in a serial representation case, a defendant who did not raise an objection at trial must demonstrate by clear and convincing evidence that his or her counsel converted a potential conflict of interest into an actual conflict of interest by (1) knowingly failing to disclose to the defendant or the circuit court before trial the attorney's former prosecution of the defendant, or (2) representing the defendant in a manner that adversely affected the defendant's interests. If either of these factors can be shown, the circuit court should provide the defendant with appropriate relief. If an attorney knowingly fails to disclose to a defendant or the circuit court his or her former role in prosecuting the defendant, the attorney is subject to discipline from the Board of Attorneys Professional Responsibility.

*Id.*

¶56.    Here, we decline to issue a specific rule to govern this type of situation. Again, Galloway's PCR claim is time barred. And as the trial court found, at Galloway's own doing, the carjacking charge filed against him in 2002 failed to proceed and was passed to the inactive files in 2004, and it was not reinstituted until 2006 after Galloway's arrest for new

18

drug charges. Further, Galloway did not file a PCR claim alleging his conflict-of-interest claim until 2015.

¶57. Thus, even though we conclude that Martin failed to take appropriate measures when taking on legal representation of Galloway, we cannot conclude that Martin knowingly failed to disclose to Galloway and the trial court that she had prior involvement with Galloway's criminal case during her time at the district attorney's office. This is what the trial court ultimately concluded to be the case based on credibility determinations and other factual findings.

¶58. Finding no clear error with the trial court's findings, we affirm the trial court's denial of post-conviction relief.

## CONCLUSION

¶59. For these reasons, the trial court's denial of Galloway's motion for post-conviction relief is affirmed.

¶60. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶61. I respectfully dissent. The majority finds that Galloway's motion for post-conviction relief (PCR) is time barred and that Galloway failed to show that he suffered from an actual conflict of interest. I find that Galloway's claim involves a fundamental constitutional right, which overcomes the time bar, and that Attorney Martin's later representation of Galloway

19

was a *per se* actual conflict of interest. As such, Galloway is entitled to an automatic reversal of his conviction. I would grant his motion for PCR and would reverse and remand for a new trial.

¶62.    The majority is correct that Galloway filed his PCR claim more than seven years after his conviction; but it does not consider whether his fundamental right to effective assistance of counsel suffered any adverse effect. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." U.S. Const. amend. VI; U.S. Const. amend XIV. The Sixth Amendment right to counsel protects a defendant's "fundamental right to a fair trial." ***Strickland v. Washington***, 466 U.S. 668, 684, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The "right to counsel, conflict free, is attendant to the Sixth Amendment right to effective assistance of counsel." ***Armstrong v. State***, 573 So. 2d 1329, 1334 (Miss. 1990); *see also* ***Sykes v. State***, 624 So. 2d 500, 503 (Miss. 1993) ("It is axiomatic that the Sixth Amendment right to counsel encompasses a right to effective assistance from an attorney who is conflict-free."). Mississippi's constitution and case law guarantee a defendant's right to effective assistance of counsel, providing that "[i]n all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both . . . ." Miss. Const. art. 3, § 26; *see also* Miss. Const. art 3, § 14 ("No person shall be deprived of life, liberty, or property except by due process of law."). "It is conceivable that under the facts of a particular case, this Court might find that a lawyer's performance was so deficient, and so prejudicial to the defendant, that the defendant's fundamental constitutional rights were violated." ***Bevill v. State***, 669 So. 2d 14,

17 (Miss. 1996). Additionally, this Court has held "unequivocally, that errors affecting fundamental constitutional rights are excepted from the procedural bars of the UPCCRA." *Rowland v. State*, 42 So. 3d 503, 506 (Miss. 2010). Galloway's claim concerns an actual conflict of interest that affects his fundamental right to conflict-free counsel and is "excepted from the procedural bars of the UPCCRA." *Id.*

¶63. I disagree also with the majority's application of federal standards over Mississippi's standard for determining the existence of conflicts of interest. The majority focuses on the federal standards articulated by the United States Supreme Court in *Strickland* and *Cuyler v. Sullivan*. Maj. Op. ¶ 43 (citing *Strickland*, 466 U.S. 668; *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). While these federal standards have some applicability to this case, they merely pronounce the "minimum standard that the federal government has set for itself;" this Court is "empowered by our state constitution to exceed federal minimum standards of constitutionality[.]" *Downey v. State*, 144 So. 3d 146, 151 (Miss. 2014); *see also Penick v. State*, 440 So. 2d 547, 551 (Miss. 1983) ("We . . . reserve for this Court the sole and absolute right to make the final interpretation of our state Constitution . . . ."). This Court exercised its state constitutional authority by establishing for Mississippi a higher standard for the determination of actual conflicts of interests than that required by *Cuyler* in *Kiker v. State*, 55 So. 3d 1060 (Miss. 2011).

¶64. In *Kiker*, while recognizing the *Cuyler* standard, we made clear the higher standard that our state courts are to apply when an accused person is represented by an attorney who has a conflict of interest. *Kiker*, 55 So. 3d at 1065-66. The lower federal standard explained

21

in *Cuyler* is that "prejudice is presumed when counsel is burdened by an actual conflict of interest[,]" but the "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler*, 446 U.S. at 350). In *Kiker*, this Court reinforced its holding in *Armstrong* that, "[w]hen the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of counsel as a matter of law, and 'reversal is automatic irrespective of a showing of prejudice unless [the accused] knowingly and intelligently waived his constitutional right to conflict free representation.'" *Id.* at 1066 (alteration in original) (quoting *Armstrong*, 573 So. 2d at 1335). Unlike *Cuyler*, our standard, as set out in *Kiker*, does not require a showing that the attorney's performance was adversely affected by the conflict of interest, but it requires only a showing that an actual conflict of interest exists. The standard set forth in *Kiker* embraces this Court's rationale that

> Once an actual conflict is demonstrated, a showing of specific prejudice is not necessary, for to hold otherwise would engage a reviewing court in unreliable and misguided speculation as to the amount of prejudice suffered by a particular defendant. An accused's constitutional right to effective representation of counsel is too precious to allow such imprecise calculations.

*Id.* (quoting *Littlejohn v. State*, 593 So. 2d 20, 25 (Miss. 1992)). This Court has stated plainly that the prejudice standard of *Strickland* does not apply to Mississippi state court cases in which an actual conflict of interest exists. *Id.*

¶65.    The *Kiker* standard "turns on whether there was an actual, as opposed to a potential, conflict of interest." *Id.* at 1067. Only when the conflict of interest is a potential one is a

22

defendant required to show that "a conflict of interest actually affected the adequacy of his representation" as enunciated in **Cuyler**. **Id.** at 1066 (internal quotation marks omitted) (quoting **Mickens v. Taylor**, 535 U.S. 162, 168, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)). Thus, the Mississippi standard differs from the federal standard articulated in **Cuyler**: when a lawyer's representation creates an actual conflict of interest, this constitutes "*per se* ineffective assistance of counsel," requiring automatic reversal, regardless of the defendant's ability to demonstrate prejudice. **Rowsey v. State**, 188 So. 3d 486, 498 (Miss. 2015) (citing **Kiker**, 55 So. 3d at 1067)).

¶66.   The majority expresses "great consternation with the obvious lack of diligence on Martin's part in this case" but finds, nevertheless, that the conflict of interest in this case was purely hypothetical. Maj. Op. ¶¶ 49, 51. While I share the majority's consternation, the facts and the applicable law compel my respectful rejection of its conclusion that Martin's conflict does not rise above the level of a mere hypothesis.

¶67.   As an assistant district attorney Martin was representing the State, as was her duty, when this case arrived in the Office of the District Attorney for the 19th Circuit Court District. From the record it is indisputable that, as a prosecutor, she did considerable work on the case, which included agreeing—on behalf of the State—to a continuance, requesting the issuance of witness subpoenas for Galloway's scheduled trial, informing the court of a plea recommendation, announcing to the court that the State was ready for trial, obtaining from the court a bench warrant for Galloway's arrest, and signing—on behalf of the State—an agreed order setting aside the bench warrant and a judgment *nisi*. The court

documents and the transcript of pretrial proceedings lead to the conclusion that Martin actually was in charge of the prosecution, and this is acknowledged by the majority. Maj. Op. ¶ 8. For this work and more, Martin was paid by the state of Mississippi, as she should have been.

¶68.    Years later, after she had been an unsuccessful candidate for district attorney for the same district in which she had worked as an assistant district attorney,[8] Galloway, who had disappeared for a few years, reappeared in her life when, as a private practitioner, Martin was offered employment, either by him or by someone acting on his behalf, to serve Galloway as his defense attorney in the very same case. When offered that opportunity, if Martin actually conducted a routine conflicts check before accepting the employment, she either made an extraordinarily careless oversight, or she accepted the case without regard to the glaringly obvious conflict of interest. It appears that Martin chose an attorney fee over diligent and ethical conduct. Sadly, this attorney created the ultimate conflict of interest. No two legal interests could be more fundamentally adverse than those of the prosecution versus the defendant in criminal litigation. There is nothing hypothetical about such a conflict.

¶69.    As the majority has said, an actual conflict of interest exists when an attorney "is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." Maj. Op. ¶ 48 (internal quotation mark omitted) (quoting ***Perillo v. Johnson***, 205

---

[8]Martin ran for district attorney in 2003. She left the district attorney's office after the new district attorney, who had defeated her in the election, took office at the beginning of 2004.

F.3d 775, 781 (5th Cir. 2000)); *see also **Kiker***, 55 So. 3d at 1067 ("Barnett owed a duty of loyalty both to Kiker and to Crawford, a duty that was impossible to fulfill if one of his clients was offering testimony against the other. . . . Therefore, we find that Barnett was under an actual conflict of interest, and Kiker need not demonstrate any specific prejudice to his defense."). This Court has held that, "[u]nder our system of jurisprudence, if a lawyer is not one hundred percent loyal to his client, he flunks." ***Littlejohn***, 593 So. 2d at 22. Thus, I would find that Attorney Martin's switching sides[9] created a situation in which her duty of loyalty was compromised and was split between Galloway and the State, resulting in an actual conflict of interest. Galloway is not required to show that he was prejudiced.

¶70.    Regarding duties owed by lawyers to criminal defendants, this Court has held that

> Even if we begin with the proposition that counsel's conduct is presumed to be within the wide range of reasonable professional conduct, certain indispensable duties are required of an attorney representing a criminal defendant. ***Leatherwood v. State***, 473 So. 2d 964, 969 (Miss. 1985). These duties include, but are certainly not limited to, assisting the defendant, informing her of important decisions and developments, asserting the client's position with zeal. ***Id.***

***Armstrong***, 573 So. 2d at 1334. Martin owed a duty of loyalty both to Galloway and to the State. *See* Miss. R. Prof'l Conduct 1.7 cmt. ("Loyalty is an essential element in the lawyer's relationship to a client."). Martin owed Galloway not only a duty of loyalty, but also a duty to act as his zealous advocate. As a prosecutor, Martin could have acquired knowledge about Galloway's case—perhaps even confidential or personal information about the crime

---

[9]"Switching sides occurs when an attorney starts out representing one party, then represents an adverse party in the same or related litigation." ***Vega v. Johnson***, 149 F.3d 354, 357 (5th Cir. 1998).

victim—that no defense counsel would have been entitled to have. Martin could not use this sort of information for Galloway's benefit because she was under a duty of loyalty to the State to keep such information confidential. *See* Miss. R. Prof'l Conduct 1.6 cmt. ("The duty of confidentiality continues after the client-lawyer relationship has terminated."). Her possession of such knowledge is one of the circumstances that breaches her duties of loyalty and zeal to Galloway. Martin cannot satisfy her duty of being one hundred percent loyal to Galloway or her duty to be a zealous advocate for Galloway if she is bound to keep certain information from her client or if she is limited in her ability to use it for his benefit.

¶71. In order to advocate zealously for Galloway, Defense Attorney Martin would have to attack the work she had done on the case as a prosecutor. Galloway supported his position by providing expert opinions on Mississippi legal ethics. One expert, Professor Donald Campbell, submitted an affidavit in which he attested that a lawyer could not be a zealous advocate in this type of situation because the lawyer would have to attack his or her own work product done as a prosecutor. Another expert on Mississippi legal ethics, Professor Benjamin Cooper, testified in agreement with Professor Campbell. The two of them opined that any attack Martin would make on her own work as a prosecutor would be against the interest of her former client, the State, and any failure or reluctance to attack her prosecutorial work would be detrimental to Galloway. The State provided no evidence to the contrary.

¶72. Because Attorney Martin switched sides, she compromised her professional relationship not only with Galloway, but also with the State, making it impossible to fulfill

her duties to both. Thus, Attorney Martin created an actual conflict of interest when she signed on as Galloway's lawyer.

¶73.    Martin was constrained by several ethical duties. *See* Miss. R. Prof'l Conduct 1.7(b); Miss. R. Prof'l Conduct 1.9(a). Under Mississippi Rule of Professional Conduct 1.7(b), she had a duty to avoid representation of a client, such as Galloway, when the representation might "be materially limited" by her duties to "another client or a third person," here, the State. She had a duty to her former client, the State, to refrain from "represent[ing] another in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client" without the former client's consent. Miss. R. Prof'l Conduct 1.9(a). Clearly, the interests of the State and Galloway did not change from the beginning of this case to its end. They always were, and they always will be, adverse, each to the other.

¶74.    The Mississippi Court of Appeals has dealt with a case in which a former prosecutor represented a defendant after having prosecuted that defendant years earlier for an unrelated crime, not for the *same* crime, as here. *See Gregory v. State*, 96 So. 3d 54, 56-57 (Miss. Ct. App. 2012). In *Gregory*, Attorney T.R. Trout, who had prosecuted Gregory six years earlier on an unrelated drug charge, agreed to defend Gregory for possession of cocaine. *Id.* The Court of Appeals, although it did not cite *Kiker*, nevertheless applied the standard set forth in *Kiker* and applied Rule 1.9 in determining whether an actual conflict of interest existed. *Id.* at 57-58. The court found that, although "Trout had represented the State where Gregory's (his current client) interests were materially adverse to the State's (his former

client) interests," there was no evidence that Trout's duty of loyalty was compromised. *Id.* at 58. Unlike Attorney Trout, Martin's representation of Galloway was for the same, exact matter in which she had represented the State. Rule 1.9(a) clearly prohibited Attorney Martin's representation of Galloway.

¶75.    In *Gray v. State*, a defense attorney, Robert Taylor, met with Gray at a jail for approximately forty-five minutes with a view toward employment as his defense lawyer, but Taylor "subsequently joined the district attorney's office and actively participated in the prosecution of [Gray]." *Gray v. State*, 469 So. 2d 1252, 1254 (Miss. 1985). Although Taylor testified that "he had no independent recollection" of his conversation with Gray, the Court reversed and remanded the case, disqualifying the entire district attorney's office without regard to whether there had been an actual breach of Gray's confidential information. *Id.* at 1255. The Court reasoned that its holding "[was] not grounded upon the demonstration of any actual abuse but rather on the duty to eliminate the *very serious appearance of impropriety* present in this case." *Id.* (emphasis added).

¶76.    Similarly, Martin testified that she did not remember prosecuting or defending Galloway. This Court's firm position is that, once an actual conflict has been demonstrated, the conviction shall be reversed automatically. *Kiker*, 55 So. 3d at 1066. There is no need to show specific prejudice because doing so would require courts to engage in "unreliable and misguided speculation" and "[a]n accused's constitutional right to effective representation of counsel is too precious to allow such imprecise calculations." *Id.* at 1066-67 (quoting *Littlejohn*, 593 So. 2d at 25). Therefore, as in *Gray*, we are not to engage in speculation

28

about what Martin truly knew, but instead we must perform this Court's duty to eliminate the extreme appearance of impropriety caused by Martin's having switched sides.

¶77.    The defendant need only demonstrate that the duty of loyalty has been compromised to establish the existence of an actual conflict of interest. *Id.* at 1067. Here, Galloway demonstrated that an actual conflict of interest existed by establishing that Martin was the assistant district attorney handling the carjacking charge before she swapped sides to defend Galloway on the same charge. The majority concentrates on whether Martin was aware of the existence of the conflict of interest rather than on whether her duty of loyalty was compromised by her prior, hands-on representation of the State in the same case. Even though Martin testified she did not remember prosecuting or defending Galloway, she did acknowledge that, as she reviewed the documents while on the witness stand, she started to remember some of the facts regarding Galloway's case. This testimony establishes that Martin had failed to consider whether a conflict of interest existed before agreeing to represent Galloway. The date of the offense alone should have triggered, at the very least, her memory that she was an assistant district attorney at that time. Even if she had neglected to engage in a pre-employment conflicts check, her review of the court file should have made her own name jump out at her, at which point she should have withdrawn as Galloway's lawyer. It is inconceivable that Martin, in the normal course of handling this case, would not have realized that she had a major conflict. Upon such realization she should have informed Galloway, the judge, and the prosecutor. In the absence of an informed waiver by Galloway she should have withdrawn, although I think it highly probable that the district attorney

29

would have opposed her continued involvement as Galloway's attorney.

¶78.    In the *Gray* case this Court reversed and remanded a conviction, and in the process disqualified, on remand, every lawyer in the largest district attorney's office in the state,[10] "to eliminate the very serious appearance of impropriety in this case." *Gray*, 469 So. 2d at 1255. The appearance of impropriety is of equal, if not greater, seriousness in the present case. Let us not overlook that, in addition to the general public, the judiciary, and the Bar, this impropriety may well have appeared especially egregious to the crime victim, who undoubtedly had interaction with the prosecutor in charge, Assistant District Attorney Martin, in the early stages of the case. At the beginning of this case Martin was Assistant District Attorney Martin, which stands in stark contrast to the end of the case when Defense Attorney Martin stood beside the defendant, Galloway, imploring the sentencing judge to deal leniently with him. It is hard to think of any aspect of this scenario that would instill in anyone an abiding confidence in the fairness of Mississippi's criminal justice system. It is far less difficult to imagine how it could have had a drastically opposite effect.

¶79.    The ethical rules about conflicts of interest and the myriad judicial decisions that apply them to real-life criminal cases, such as this one, exist to protect the integrity of our system of justice and of the legal profession, and to assure, insofar as is humanly possible, that the courts, consistently and reliably, are fair, and that they *look* fair. It therefore is not surprising that this Court was so deeply concerned about the very *appearance* of impropriety that moved it to reverse in the *Gray* case. We should be as concerned today. The affirmance

---

[10]The 7th Circuit Court District, then comprised of Hinds and Yazoo Counties.

of Galloway's conviction, under these circumstances, will not reflect favorably upon the integrity and fairness of this Court.

¶80.   Attorney Martin's prosecution of Galloway in the carjacking case, followed by her switching sides to defend him in the same case, created a *per se* conflict of interest that mandates automatic reversal. Galloway was deprived of his fundamental right to effective, conflict-free counsel and of the prospect of a fair trial. This Court should grant Galloway's motion for post-conviction relief, reverse his conviction, and remand for a new trial.

**KING, P.J., JOINS THIS OPINION.**